**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **ASHLEY BARNHILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 06-0282-CB-C** |
| | ) | |
| **TEVA PHARMACEUTICALS USA,** | ) | |
| **INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**TEVA PHARMACEUTICALS USA, INC.'S BRIEF IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................3
    A.    Background and Procedural History.............................................................4
    B.    Plaintiff's Ingestion of Cephalexin ............................................................5
    C.    Plaintiff's Alleged Injuries.........................................................................6
    D.    Federal Regulation of Generic Drugs ........................................................7
    E.    Teva USA's Cephalexin Product and Labeling .........................................9

ARGUMENT ..........................................................................................................10

I.      SUMMARY JUDGMENT STANDARD...........................................................10

II.     PLAINTIFF'S FAILURE TO WARN CLAIMS FAIL.......................................11
    A.    As a Matter of Law, Teva USA Satisfied Its Duty to Warn With Respect
        to Its Cephalexin Product Because Teva USA's Cephalexin Labeling
        Adequately Warned the Learned Intermediary of the Potential Risk of SJS........11
    B.    There Can Be No Proximate Causation Between Teva USA's SJS
        Warning and Plaintiff's Injuries Due to Alabama's Application of  the
        Learned Intermediary Doctrine.................................................................14
    C.    Plaintiff Lacks Admissible Evidence of Specific Causation ..................16

    III.    PLAINTIFF'S CLAIMS FAIL TO STATE A CLAIM INSOFAR AS ANY
        ATTEMPT TO IMPOSE TORT LIABILITY UPON TEVA USA UNDER
    STATE COMMON LAW IS PREEMPTED BY THE SUPREMACY CLAUSE
    OF THE CONSTITUTION AND FEDERAL LAW..........................................19
    A.    Conflict Preemption Applies to Preempt Plaintiff's State Law Claims................20
    B.    Since April 2007, FDA Reaffirmed on Several Occasions Its Long-
        Standing Position That Generic Drug Manufacturers May Not Unilaterally
        Strengthen or Amend Their Labeling .......................................................21
    C.    Since April 2007, Several Federal Courts Have Considered the Issue of
        Federal Preemption As It Applies to Generic Drug Manufacturers, and
        Have Unanimously Held That State Law Claims Against Generic Drug
        Manufacturers Are Preempted .................................................................25
    D.    Plaintiff Has Presented No Evidence that Teva USA Is Permitted to Alter
        Its Cephalexin Labeling; Rather, Plaintiff's Own Expert Witness Supports
        Teva USA's Contrary Position ................................................................28

    IV.    PLAINTIFF'S REMAINING CLAIMS FAIL BECAUSE THEY ARE
    ENTIRELY UNSUPPORTED BY ANY EVIDENCE IN THE RECORD.....................30
    A.    Plaintiff Has Not Set Forth a Claim For Failure to Use Reasonable Care in
        Formulating and Manufacturing Cephalexin...........................................30
    B.    Plaintiff Has Not Set Forth a Claim of Inadequate Pre-Clinical and
        Clinical Testing of Cephalexin ...............................................................30

C.      Plaintiff Has Not Set Forth a Claim of Inadequate Post-Marketing
        Surveillance..........................................................................................................31
D.      Plaintiff Has Not Set Forth a Claim For Breach of Express Warranty.................32
E.      Plaintiff Has Not Set Forth a Claim For Breach of Implied Warranty .................33
F.      Plaintiff Has Not Set Forth a Claim For Punitive Damages .................................34

CONCLUSION............................................................................................................................35

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................10

*Bolin v. SmithKline Beecham Corp.*,
    2008 WL 3286973 (S.D. Fla. Aug. 7, 2008).................................................26, 27

*Brasher v. Sandoz Pharm. Corp.*,
    2001 U.S. Dist. LEXIS 18364 (N.D. Ala. 2001) ....................................................14

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................................10

*Colacicco v. Apotex, Inc.*,
    521 F.3d 253 (3d Cir. 2008) .....................................................................................26

*Cordoba v. Dillard's Inc.*,
    419 F.3d 1169 (11th Cir. 2005) ................................................................................10

*Deere & Co. v. Grose*,
    586 So. 2d 196 (Ala. 1991)...............................................................................11, 14

*Dunn v. Sandoz Pharm. Corp.*,
    275 F.Supp.2d 672 (M.D.N.C. 2003) .......................................................................17

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982)..................................................................................................20

*Gaeta, et al. v. Perrigo Pharmaceutical Company, et al.*,
    No. 05-04115 (N.D. Cal. June 13, 2008)..................................................................26

*Gordon v. Proctor & Gamble Distrib. Co.*,
    789 F. Supp. 1384 (W.D. Ky. 1992).........................................................................13

*Griggs v. Combe*,
    456 So. 2d 790 (Ala. 1984)...............................................................................13, 34

*Hillsborough County v. Automated Med. Lab.*,
    471 U.S. 707, 713 (1985)..........................................................................................21

*In re Baycol Products Litigation*,
    321 F. Supp.2d 1118 (J.P.M.L. 2004).......................................................................17

*Jackson v. E&R Mfg. Co.*,
    2007 WL 2806831 (M.D. Ala. Sept. 25, 2007) ........................................................13

*Lil' Joe Wien Music, Inc. v. Jackson*,
    2007 WL 2274519 (11th Cir. 2007) .........................................................................11

*Masterson v. Apotex Corp.*,
    2008 WL 3262690 (S.D. Fla. Aug. 7, 2008)........................................................26, 27

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ...............................................................................17

*Mensing v. Wyeth, Inc., et al.*,
    No. 07-3919 (N.D. Minn. June 17, 2008) ........................................................25, 26

*Riegel v. Medtronic, Inc.*,
    128 S.Ct. 999 (2008).................................................................................................24

*Rodgers v. Shaver Mfg. Co.*,
    993 F. Supp. 1428 (M.D. Ala. 1998) .......................................................................11

*Short v. Edison Chouest Offshore*,
    638 So. 2d 790 (Ala. 1994).......................................................................................13

*Spain v. Brown & Williamson Tobacco Corp.*,
    363 F.3d 1183 (11th Cir. 2004) ...............................................................................13

*Stone v. Smith, Kline & French Labs.*,
    447 So. 2d 1301 (Ala. 1984)..............................................................................11, 12

*Thom v. Bristol-Myers Squibb Co.*,
    353 F.3d 848 (10th Cir 2003) ..................................................................................15

*Toole v. Baxter Healthcare Corp.*,
    235 F.3d 1307 (11th Cir. 2000) ...............................................................................11

*Valerio v. SmithKline Beecham Corp.*,
    2008 WL 3286976 (S.D. Fla. Aug. 7, 2008)........................................................26, 27

*Walls v. Alpharma USPD, Inc.*,
    887 So. 2d 881 (Ala. 2004).......................................................................................11

*Wyeth v. Levine*,
    128 S. Ct. 1118 (January 18, 2008) ........................................................... 24, 27, 28

## STATUTES

21 U.S.C. § 321 ......................................................................................................8, 31

21 U.S.C. § 355(j) ...............................................................................................8, 9, 22

35 U.S.C. §§ 156, 271, 281 .........................................................................................8

Ala. Code § 6-11-20(a) (1987).................................................................................35

Ala. Code § 7-2-314 (2005) ...........................................................................................33, 34

Drug Price Competition and Patent Restoration Act of 1984 (the "Hatch-Waxman
    Amendments") ...................................................................................................7, 8, 27

Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq. ................................................7, 8

## OTHER AUTHORITIES

21 C.F.R. Part 314 ..............................................................................................................7

21 C.F.R. § 314.70(c) ...................................................................................9, 21, 22, 23

21 C.F.R. §§ 314.80, 314.81(b)(2)(i) ..............................................................................32

21 C.F.R. § 314.150(b) ......................................................................................................22

57 FR 17950, 17953, 17961 ..............................................................................................22

73 Fed. Reg. 2848 (January 16, 2008) ...............................................19, 20, 22, 23, 24

73 Fed. Reg. 49603 (August 22, 2008) ....................................................20, 22, 23, 24

Fed. R. Civ. P. 26 ..............................................................................................................17

Fed. R. Civ. P. 56(c) ..........................................................................................................10

H.R. Rep. No. 98-857 ........................................................................................................31

Restatement (Second) of Torts (1965) § 402 ...............................................................4, 33

Supremacy Clause of the United States Constitution, article VI, clause 2 ......................20

Brief for United States as *Amicus Curiae*, *Colacicco v. Apotex, Inc.*, No. 05-CV-05500
    (E.D. Pa. 2006) .........................................................................................................24

Brief for United States as *Amicus Curiae* Supporting Respondent, *Riegel v. Medtronic,
    Inc.*, No. 06-179, at 13 (U.S. Oct. 19, 2007) .....................................................23, 24

Brief for United States as *Amicus Curiae* on Petition for a Writ of Certiorari, *Wyeth v.
    Levine*, No. 06-1249, at 15 (U.S. Dec. 21, 2007) ................................................23, 2

COMES NOW defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") and submits this Brief in Support of Teva USA's Motion for Summary Judgment.[1]

## PRELIMINARY STATEMENT

In the instant case, Teva USA is entitled to summary judgment.  Plaintiff Ashley Barnhill ("Plaintiff") contends that she experienced a Stevens-Johnson Syndrome ("SJS") adverse reaction to Teva USA's drug cephalexin.  Cephalexin is the generic form of the branded drug Keflex® and is approved by the United States Food and Drug Administration ("FDA") as an antibiotic indicated for treatment of various infections.  Teva USA's cephalexin label expressly warns of possible side effects associated with the drug, including hypersensitivity reactions and specifically SJS.  Plaintiff nevertheless alleges, *inter alia*, that Teva USA failed to adequately warn of the risks associated with the use of cephalexin.

Plaintiff's failure to warn claims fail for several reasons.  *First*, Teva USA in fact fulfilled its duty to warn with respect to its cephalexin product.  Under Alabama's learned intermediary doctrine, a pharmaceutical manufacturer's duty to warn of potential adverse effects of a drug extends only to the prescribing physician, not to the patient.  Teva USA's cephalexin package insert provided a clear and adequate warning of a possible SJS reaction to Plaintiff's prescribing physician, Dr. Dina Jaalouk, thus satisfying any duty to warn that Teva USA may have had.  *Second*, Plaintiff has failed to prove proximate causation, because she has not and cannot demonstrate that Dr. Jaalouk would not have prescribed cephalexin if the SJS warning were different.  To start, there is no evidence that Dr. Jaalouk read Teva USA's package insert prior to prescribing the drug to Plaintiff; therefore, a different warning in the package insert would have had no effect on the prescribing decision.  In addition, Dr. Jaalouk testified that she

---

[1] Defendant Teva Pharmaceutical Industries, Ltd. has concurrently filed a separate Motion for Summary Judgment.

has prescribed cephalexin for many years, and continues to prescribe it today, despite her awareness of the risk of SJS associated with the drug. The record is completely devoid of any evidence of how Dr. Jaalouk would have acted if she were aware of a stronger or different SJS warning on the cephalexin label. Thus, Plaintiff has not and cannot prove that a stronger or different warning would have affected Dr. Jaalouk's decision to prescribe cephalexin to Plaintiff. *Third*, Plaintiff has failed to present any evidence that Teva USA's product actually caused Plaintiff's SJS reaction – the requisite element of specific causation underlying Plaintiff's failure to warn and other claims. In fact, Plaintiff's own expert witness testified that he is unaware of any reports in all of the world-wide medical literature where the extremely rare hypersensitivity reaction of SJS occurred under the circumstances alleged in the instant case – on an individual's fourth or fifth exposure to the drug.

Moreover, all of Plaintiff's claims fail insofar as they attempt to hold Teva USA liable under state law for failing to make changes to its cephalexin label without prior FDA approval, in clear conflict with federal law proscribing such unilateral changes. Although this Court previously considered the issue of federal preemption in this case in April 2007, Teva USA has since acquired significant new regulatory, legal, and evidentiary support for its federal preemption argument. In 2008, FDA promulgated proposed rulemaking and published a Final Rule unequivocally reaffirming its long-standing position that manufacturers of generic drugs, such as Teva USA, cannot unilaterally change their drug labeling without prior FDA approval. In addition, in the past few months a clear trend on this issue has emerged among the federal courts, with three district courts holding in five separate cases that failure to warn claims against generic drug manufacturers are preempted by federal law. Finally, at the close of discovery in this case, Plaintiff still had not presented any evidence to support her contention that Teva USA

could have changed its cephalexin labeling.  In fact, all evidence in the case, including the testimony of Plaintiff's own expert witness on labeling and warnings, supports Teva USA's contrary contention.  For these reasons, in light of the new regulatory, legal, and evidentiary support, Teva USA respectfully asks this Court to grant summary judgment, and to hold that Plaintiff's state law claims against Teva USA are preempted by federal law.

Plaintiff's Complaint also alleges several ancillary claims against Teva USA, none of which are supported by even a shred of evidence in the record.  Plaintiff cannot point to any concrete facts or specific evidence to show that Teva USA failed to meet any of its obligations under federal law with respect to the testing, formulating, manufacturing, or post-marketing surveillance of its cephalexin product.  On the contrary, all evidence clearly demonstrates that Teva USA has complied with all of its requirements.  Likewise, Plaintiff's breach of express and implied warranty claims are not supported by a single fact, as Teva USA specifically warned in its cephalexin labeling that the drug is associated with various side effects, including, in rare circumstances, SJS.  Finally, Plaintiff has put forth no evidence, much less clear and convincing evidence, that Teva USA's conduct warrants the imposition of punitive damages.

For all of these reasons, Teva USA is entitled to summary judgment on all of Plaintiff's claims against it.

## STATEMENT OF FACTS

All facts are described in a light most favorable to Plaintiff[2] and, even in that light, do not give rise to any genuine issue of material fact on any of Plaintiff's claims.

---

[2] Teva USA has construed the evidence in a light most favorable to Plaintiff, as required for purposes of a motion for summary judgment.  Nevertheless, Teva USA reserves its right to contest at trial any allegations of fact stated herein.

### A.      Background and Procedural History

This diversity action seeks relief under Alabama law for injuries allegedly suffered by

Plaintiff as a result of the use of cephalexin, a cephalosporin antibiotic indicated for treatment of

various infections.  Plaintiff alleges that as a result of her use of cephalexin, she developed a

severe allergic reaction known as Stevens-Johnson Syndrome.

Plaintiff's Complaint (Ct. Doc. 1) asserts the following claims against Teva USA:

1.      Strict liability under § 402A of the Restatement (Second) of Torts for defect in
        design or manufacture of cephalexin (Ct. Doc. 1 ¶ 16);
2.      Strict liability under § 402B of the Restatement (Second) of Torts for
        misrepresentation in connection with cephalexin (Ct. Doc. 1 ¶ 19);
3.      Negligent failure to test and warn about adverse events associated with cephalexin
        (Ct. Doc. 1 ¶ 20);
4.      Negligent "design, testing, advertising, warning, marketing and sale of
        Cephalexin" by:
        a.      failing to use reasonable care in formulating and manufacturing
                cephalexin to avoid risks to individuals prescribed cephalexin;
        b.      failing to provide proper warnings regarding possible adverse effects and
                potential health dangers and risks associated with cephalexin;
        c.      failing to conduct pre-clinical and clinical testing and post marketing
                surveillance concerning the effective use and safety of cephalexin;
        d.      failing to provide adequate training and information to physicians
                concerning the appropriate use and safety of cephalexin;
        e.      failing to warn or advise consumers and Plaintiff, through physicians,
                orally or in writing, of the increased risk of severe skin rash or SJS; and
        f.      was otherwise negligent (Ct. Doc. 1 ¶ 22);
5.      Breach of express warranty that cephalexin is a safe and effective drug (Ct. Doc. 1
        ¶ 25);
6.      Breach of implied warranty of merchantability (Ct. Doc. 1 ¶ 26); and
7.      Punitive damages (Ct. Doc. 1 ¶¶ 24, 29).

This Court previously dismissed Plaintiff's strict liability claims under §§ 402A and

402B.[3]  (Ct. Doc. 59.) Teva USA maintains that Plaintiff has failed to support any of her weakly-

---

[3] Plaintiff did not amend her Complaint after this Court dismissed her strict liability claims.  Therefore, there are no products liability claims remaining in this case.  Plaintiff's primary theory of liability is negligent failure to warn.

pleaded claims with sufficient evidence to permit any of the remaining claims to survive

summary judgment.[4]

###    B.        Plaintiff's Ingestion of Cephalexin

Plaintiff alleges that on January 27, 1998, she was prescribed Keflex by Dr. Dina Jaalouk

for treatment of streptococcal pharyngitis.  (Ct. Doc. 1 ¶ 12.)  On the same day, Plaintiff

allegedly filled a prescription for a cephalexin product with National Drug Code (NDC) number

00093-3147-01.[5]  (Ex. A.)  This NDC number is associated with Abbreviated New Drug

Application ("ANDA") No. 62-702 held by Teva USA, and with Teva USA's 500 mg cephalexin

capsules manufactured under this ANDA.  (Ex. B.)  For the last four decades, cephalexin has

been one of the most widely prescribed antibiotics worldwide and is extremely beneficial in the

treatment of bacterial infections.  (Ex. C, Brent Report at 8.)  As discussed in detail *infra*, the risk

of developing SJS from the use of cephalexin is very low – "in the less than one per 10 million

range."  (Ex. D, Lamm Report at 9.)[6]

Plaintiff's mother, Mary Hodges, testified that Plaintiff began taking cephalexin on

January 27, 1998 and continued to take it for seven days (thus ceasing to take it on or about

---

[4] With respect to all of Plaintiff's claims, this Court previously stated:  "The complaint borders on the type of shotgun pleading that Judge Tjoflat has warned against on many occasions."  (Ct. Doc. 59 n. 4.)

[5] The first five digits of a NDC number, in this instance "00093", comprise the so-called labeler code, uniquely identifying the company under whose name the product is sold.  00093 is the number assigned to Teva USA.  The second four digits are the product code, which uniquely identifies the active pharmaceutical ingredient of the labeler's product and its dosage.  Taken together, the labeler code and product code of a product can be identified to a specific NDA or ANDA.  In this instance 00093-3147 is assigned to Teva USA's ANDA No. 62-702 for cephalexin capsule 500 mg.  The Court may take judicial notice of the facts relating to the National Drug Code Directory, which are documented on the FDA web site at http://www.fda.gov/cder/ndc/index.htm.  For purposes of this Motion only, Teva USA does not dispute Plaintiff's contention that this NDC number corresponds to the cephalexin product allegedly ingested by Plaintiff.  It should be noted, however, that notwithstanding the extensive discovery in this litigation to date, Plaintiff has put forth no admissible evidence demonstrating that Plaintiff did, in fact, ingest a cephalexin product bearing this NDC number.

[6] Because Plaintiff has not provided any quantitative evidence concerning the incidence of SJS from ingestion of cephalexin, Teva USA relies on the uncontested quantitative evidence of its expert witness in epidemiology, Dr. Steven H. Lamm, who arrived at his quantitative conclusions after a thorough review of the relevant worldwide medical and epidemiological literature of reports of SJS and cephalexin.  (Ex. D, Lamm Report.)

February 2, 1998).  (Ex. E, Hodges Dep. 74:1-7, 70:19 - 74:7.)  Plaintiff's mother testified

further that during the first week of March 1998, Plaintiff ingested additional cephalexin left

over from the prior prescription.[7]  (*Id.* at 81:2-22.)  Prior to January 1998, Plaintiff was

prescribed Keflex on at least three separate occasions – on April 11, 1996, on January 12, 1997,

and on March 12, 1997.  (Ex. F.)  Discovery did not disclose that Plaintiff or her mother at any

time ever reviewed or referred to any Teva USA labels, package inserts, or other prescribing

information with respect to cephalexin prior to Plaintiff's ingestion of the drug.  In fact,

Plaintiff's mother specifically testified that she did not review Teva's labels. (Ex. E, Hodges

Dep. 73:5-14, 241:13-23.)

### C.      Plaintiff's Alleged Injuries

On March 10, 1998, Plaintiff presented to Dr. Jaalouk with red eyes and a rash.  (*Id.* at

60:5-16.)  Over the next day, Plaintiff's symptoms worsened, and she presented to her primary

care physician, who then referred her to the Atmore Community Hospital.  (Ex. G.)  That

evening Plaintiff was transferred to the University of South Alabama Children's & Women's

Hospital ("USA Hospital"), where Plaintiff was diagnosed with SJS.  (Ex. H.)  This diagnosis

was confirmed by biopsy performed on March 12, 1998.  (Ex. I.)  Plaintiff remained hospitalized

and receiving medical treatment at the USA Hospital until April 7, 1998.  (Ex. H.)  For the

purposes of this Motion, it is undisputed that during her hospitalization, Plaintiff experienced a

---

[7] For purposes of this Motion only, Teva USA does not dispute this alleged ingestion.  However, there is no evidence in the extensive medical records or elsewhere supporting this later ingestion and, in fact, the evidence contradicts this contention.  Plaintiff's mother testified that Plaintiff visited Dr. Jaalouk in the first week of March 1998 for red ears and throat, and received instructions to continue taking Keflex left over from the January 1998 prescription.  (Ex. E, Hodges Dep. 79:11 – 81:22.)  However, Plaintiff's Complaint and Interrogatory Responses (for which Ms. Hodges provided information) make no mention of this visit to Dr. Jaalouk or a March 1998 ingestion of cephalexin.  Moreover, while the extensive medical records are replete with information concerning Plaintiff's ingestion of other medications during the relevant period, there is no evidence in these records or elsewhere supporting a March 1998 ingestion of cephalexin.  In fact, the evidence contradicts Plaintiff's contention as Dr. Jaalouk has no recollection of this alleged visit, the medical records do not reflect such a visit, no charges were submitted to Plaintiff's insurance for this visit, and there are no records of a throat culture or strep screen performed in early March.

stormy course of SJS.  Plaintiff alleges that at this time she still suffers from sequellae of SJS, and that she continues to receive medical treatment for medical conditions stemming from SJS. (Ct. Doc. 1 ¶ 15.)

SJS can have multiple potential causes, including drugs and infections.  (Ex. J, Schlam Dep. 18:8-14.)  If no cause is established, it is considered to be idiopathic.  (Ex. K, Swerlick Report at 7.)  SJS can result from a hypersensitivity reaction to various drugs, including cephalexin.  (Ex. J, Schlam Dep. 79:6-12.)  There is no diagnostic test to determine a predisposition to SJS from cephalexin or from any other drug.  (Ex. C, Brent Report at 15; *see also* Ex. J, Schlam Dep. 79:6-12.)  In its most severe form, SJS is sometimes referred to as toxic epidermal necrolysis ("TEN").  (Ex. J, Schlam Dep. 12:1-4, 13:4-17.)  For the purposes of this Motion, the terms SJS and TEN are used interchangeably to refer to either condition.

### D.      Federal Regulation of Generic Drugs[8]

The manufacture and sale of branded and generic prescription drug products in the United States is a highly regulated industry, under the jurisdiction of the United States Food and Drug Administration ("FDA").  FDA draws its statutory authority as to the approval of such manufacture and sale of drugs primarily from its enabling statute, the Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq., as amended by the Drug Price Competition and Patent Restoration Act of 1984 (the "Hatch-Waxman Amendments") (collectively, the "Food and Drug Act" or "FDCA"), and has promulgated regulations implementing such statutes, which may be found in pertinent part at 21 C.F.R. Part 314.

---

[8] Teva USA previously provided this Court with a detailed overview of federal regulation of branded and generic drugs in its Motion to Dismiss.  (Ct. Doc. 18 at 3-7.)  Therefore, Teva USA presents only a summary of this process herein, and respectfully refers this Court to Teva USA's Motion to Dismiss for a detailed overview of the process.

The right to manufacture and market a branded drug in the United States is secured through the filing of a New Drug Application ("NDA").  21 U.S.C. § 355.  In order to obtain approval of a NDA, the applicant must demonstrate the safety and efficacy of the drug for its intended indications to the satisfaction of FDA, typically through the conduct of extensive clinical trials in humans.  *See id.*

The right to manufacture and market a generic drug in the United States is secured through the filing of an abbreviated NDA ("ANDA"), which process is governed by the Hatch-Waxman Amendments (codified at 21 U.S.C. § 355(j), 35 U.S.C. §§ 156, 271, 281).  The requirements that a generic manufacturer must meet under the ANDA process are set forth in Section 505(j) of the Food and Drug Act, 21 U.S.C. § 355(j).  Under these regulations, an ANDA applicant need only certify that the generic manufacturer will produce a bio-equivalent of the branded drug and that the labeling and warnings of the generic drug are identical to that of the approved innovator drug.  21 U.S.C. § 355(j)(2)(A).  The information provided in support of an ANDA must not be new or innovative, but wholly derivative of information already provided by the innovator manufacturer.  *See* § 321(aa) (ANDA must "rel[y] on the approved application of another drug with the same active ingredient to establish safety and efficacy.")  An ANDA applicant is not required or expected to conduct clinical trials to establish the safety and efficacy of its generic drug (which trials must be conducted by the manufacturer of the branded drug).  Rather, in the public policy interest of fostering competition, lower medical costs, and more affordable prescription drugs, federal regulations limit the role and responsibility of an ANDA applicant to conducting so-called "bioequivalency" studies to establish that the dosage formulation of the generic product has the same pharmacological action in the human body as does the branded drug.  21 U.S.C. § 355(j).

Under the FDCA, FDA also controls the labeling of prescription drugs.  It is FDA's role to review the proposed labeling submitted by the branded manufacturers and perform in-depth technical analysis and balancing of the benefits of the drug against the potential risks, to ultimately arrive at the final labeling.  With respect to generic drugs, the labeling or "package insert" of the generic drug may not deviate in any material respect from that of its reference listed drug – all statements as to Warnings, Precautions, Contraindications, Adverse Reactions, etc., must adhere letter for letter to the language in the corresponding provisions of the labeling of the reference listed drug.  21 U.S.C. § 355(j).  While it has sometimes been argued that an ANDA holder has a right to enhance warnings on the label for its product through the mechanism of 21 C.F.R. § 314.70(c)(6)(iii)(A), the so-called "Changes Being Effected Amendment" ("CBE") provision, in the context of prescription pharmaceuticals, FDA and federal case law have made clear that this provision is available only to NDA holders and not to ANDA holders, and that no labeling changes can be made unilaterally by a generic manufacturer.

### E.     Teva USA's Cephalexin Product and Labeling

In 1987, Teva USA's predecessor, Biocraft Laboratories, Inc. ("Biocraft"), first received approval of its ANDA No. 62-702 for its 250 mg and 500 mg cephalexin capsules.  (Ex. L.)  In May 1996, Biocraft (together with Lemmon Company) formed the corporate entity Teva Pharmaceuticals USA, Inc., and Teva USA became owner of this ANDA for cephalexin.  (Ex. M.)

In securing approval of its cephalexin ANDA, Biocraft did not conduct safety and efficacy testing *per se*, but rather conducted tests through which it demonstrated to the satisfaction of FDA that its cephalexin product is bioequivalent to the brand drug Keflex®.  Further, Biocraft, and later Teva USA, conformed its FDA-approved cephalexin labeling in all material respects, including Warnings and listed Adverse Reactions, to that of Keflex®.  Not to

have done so would have meant that the cephalexin product was misbranded, unapprovable, and

unsaleable in the United States.

It is undisputed that Teva USA's package insert for its generic cephalexin product (Ex.

N) warns of SJS as a potential adverse reaction of cephalexin, consistent with the SJS warning

contained on the Keflex® label (Ex. O):

> ADVERSE REACTIONS
> * * *
> Hypersensitivity—Allergic reactions in the form of rash, urticaria,
> angioedema, and, rarely, erythema multiforme, Stevens-Johnson
> syndrome, or toxic epidermal necrolysis have been observed.
> These reactions usually subsided upon discontinuation of the drug.

## ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

Defendants are entitled to summary judgment on Plaintiff's claims if "the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  If the moving party meets the initial burden of showing that there is no genuine

issue of material fact, the burden shifts to the nonmovant, who must go beyond the pleadings and

present affirmative evidence to show that a genuine issue of material fact does exist.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  If there is a complete failure of proof on an

essential element, there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).

It is well-established that "unsupported speculation . . . does not meet a party's burden of

producing some defense to a summary judgment motion.  Speculation does not create a *genuine*

issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of

summary judgment."  *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005); *see also*

*Lil' Joe Wien Music, Inc. v. Jackson*, 2007 WL 2274519, at *2 (11th Cir. 2007) (holding that "evidence that is merely colorable or not significantly probative is not enough" to survive summary judgment).

## II.   PLAINTIFF'S FAILURE TO WARN CLAIMS FAIL

Under Alabama law, a plaintiff must establish four elements for recovery under a failure to warn theory: duty to warn, breach of this duty, proximate causation, and injury or damage. *Deere & Co. v. Grose*, 586 So. 2d 196, 198 (Ala. 1991); *see also Rodgers v. Shaver Mfg. Co.*, 993 F. Supp. 1428, 1437 (M.D. Ala. 1998).  Plaintiff's failure to warn claims should be dismissed because Plaintiff has failed to establish these elements.

### A.   As a Matter of Law, Teva USA Satisfied Its Duty to Warn With Respect to Its Cephalexin Product Because Teva USA's Cephalexin Labeling Adequately Warned the Learned Intermediary of the Potential Risk of SJS

Teva USA has satisfied its duty to warn with respect to its cephalexin product because Teva USA's cephalexin labeling put Plaintiff's prescribing physician on notice of the risks associated with cephalexin, and specifically of the risk of SJS.

Alabama courts have adopted the learned intermediary doctrine as a defense against tort liability for pharmaceutical manufacturers.  *Stone v. Smith, Kline & French Labs.*, 447 So. 2d 1301 (Ala. 1984); *see also Walls v. Alpharma USPD, Inc.*, 887 So. 2d 881, 883 (Ala. 2004); *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1313-14 (11th Cir. 2000).  Referring specifically to prescription drugs, the *Stone* court held that manufacturers "are required to warn only the prescribing physician, who acts as a 'learned intermediary' between manufacturer and consumer," because:

> [a]s a medical expert, the prescribing physician can take into
> account the propensities of the drug as well as the susceptibilities of
> his patient.  His is the task of weighing the benefits of any
> medication against its potential dangers.  The choice he makes is an

informed one, an individualized medical judgment bottomed on a
knowledge of both patient and palliative.

447 So. 2d at 1305.  Thus, the information supplied by the drug manufacturer is only one source

a physician must consult, and the physician is expected to make an independent medical

judgment in determining whether a drug is appropriate for a particular patient.  Under the learned

intermediary doctrine, a manufacturer will be held liable only where it fails to exercise

reasonable care to inform the prescribing physician of any facts which may make the product

likely to be dangerous.  *Id.* at 1304.  Thus, a failure to warn claim cannot survive against a

manufacturer of a prescription drug where the manufacturer specifically and adequately warns

the prescribing physician of a potential adverse reaction to a drug.

Teva USA's 1996 and 1997 cephalexin package inserts (Ex. N), in effect at the time

Plaintiff was prescribed cephalexin, state in pertinent part (with underline emphasis added):

> **WARNINGS:** BEFORE CEPHALEXIN THERAPY IS
> INSTITUTED, CAREFUL INQUIRY SHOULD BE MADE
> CONCERNING PREVIOUS HYPERSENSITIVITY
> REACTIONS TO CEPHALOSPORINS AND PENICILLIN.
> CEPHALOSPORIN C DERIVATIVES SHOULD BE GIVEN
> CAUTIOUSLY TO PENICILLIN-SENSITIVE PATIENTS.
>
> SERIOUS ACUTE HYPERSENSITIVITY REACTIONS MAY
> REQUIRE EPINEPHRINE AND OTHER EMERGENCY
> MEASURES.
>
> There is some clinical and laboratory evidence of partial cross-
> allergenicity of the penicillins and the cephalosporins.  Patients
> have been reported to have had severe reactions (including
> anaphylaxis) to both drugs.
>
> Any patient who has demonstrated some form of allergy,
> particularly to drugs, should receive antibiotics cautiously.  No
> exception should be made with regard to Cephalexin.
> * * *
> **PRECAUTIONS:** *General*—Patients should be followed
> carefully so that any side effects or unusual manifestations of drug
> idiosyncrasy may be detected. If an allergic reaction to Cephalexin
> occurs, the drug should be discontinued and the patient treated

with the usual agents (eg, epinephrine or other pressor amines, antihistamines, or corticosteroids).
* * *
**ADVERSE REACTIONS**
* * *
*Hypersensitivity*—Allergic reactions in the form of rash, urticaria, angioedema, and, rarely, <u>erythema multiforme, Stevens-Johnson syndrome, or toxic epidermal necrolysis</u> have been observed. These reactions usually subsided upon discontinuation of the drug. In some of these reactions, supportive therapy may be necessary.[9]

Thus, Teva USA's package insert clearly warns physicians of the possibility of serious side effects, including acute hypersensitivity reactions, and SJS in particular.[10]  Moreover, the insert specifically suggests to physicians that patients taking cephalexin "should be followed carefully so that any side effects or unusual manifestations of drug idiosyncrasy may be detected," and advises physicians that cephalexin should be discontinued if an allergic reaction occurs.  As Plaintiff's prescribing physician, it was the role, duty, and obligation of Dr. Jaalouk – and only Dr. Jaalouk – to select the appropriate drug to treat Plaintiff and to inform Plaintiff of the associated risk of SJS or of any other risks.  Teva USA fulfilled its duty to warn by placing a warning regarding SJS on its package insert and, hence, providing the information required for

_____

[9] The 1997 and 1998 volumes of the Physician Desk Reference ("PDR") contain virtually identical language for the branded drug Keflex®, with the exception of permitted differences relating to the fact of a different manufacturer. (Ex. O.)

[10] Under Alabama law, Teva USA is not even  required to warn of the risk of SJS associated with cephalexin because SJS is an idiosyncratic reaction, and because the risk of SJS associated with cephalexin is well-known in the medical community.  Alabama courts have held that there is no duty to warn of idiosyncratic reactions.  *See Short v. Edison Chouest Offshore*, 638 So. 2d 790, 793 (Ala. 1994) ("there is no recovery for injuries which result from allergic or idiosyncratic reactions to otherwise harmless substances"); *Griggs v. Combe*, 456 So. 2d 790 (Ala. 1984); *Gordon v. Proctor & Gamble Distrib. Co*., 789 F. Supp. 1384, 1385 (W.D. Ky. 1992) ("a plaintiff's unusual or rare idiosyncratic sensitivity does not provide a basis for recovery under any theory of product liability").  Plaintiff's expert witness testified that SJS is an idiosyncratic allergic hypersensitivity reaction.  (Ex. J, Schlam Dep. 79:6-12.)  Alabama courts have also held that there is no duty to warn of a danger that is obvious.  *Jackson v. E&R Mfg. Co*., 2007 WL 2806831, at *7 (M.D. Ala. Sept. 25, 2007); *Spain v. Brown & Williamson Tobacco Corp*., 363 F.3d 1183, 1196-97 (11th Cir. 2004).  Plaintiff's expert witness testified that the association between cephalexin and severe adverse skin reactions such as SJS was "certainly known by the medical community" at the time that Plaintiff allegedly took cephalexin.  (Ex. P, Laux Dep. 201:16 – 202:1.)  For these reasons, Teva USA had no duty under Alabama law to warn of the risk of SJS.

Dr. Jaalouk to use her own independent medical judgment in prescribing the drug and in informing Plaintiff of potential risks.

Plaintiff has put forth no contrary evidence to show that Teva USA breached its legal duty to warn.  In fact, Plaintiff points solely to the expert report and testimony of her retained expert Dr. Lila Laux to support Plaintiff's failure to warn claims;[11] however, Dr. Laux expressly testified that she is not a legal expert and that she will not offer an expert opinion on what Teva was permitted to do or not permitted to do under the laws associated with pharmaceutical labeling.  (Ex. P, Laux Dep. 64:12 – 65:5, 174:11-22.)

Thus, Plaintiff has failed to show that any genuine issue of material fact exists as to whether Teva USA fulfilled its duty to warn with respect to its cephalexin product, and Plaintiff's failure to warn claims should be dismissed.

**B.    There Can Be No Proximate Causation Between Teva USA's SJS Warning and Plaintiff's Injuries Due to Alabama's Application of  the Learned Intermediary Doctrine**

Alabama law also requires a plaintiff in a products liability suit to prove the proximate cause of the injury.  *Deere*, 586 So. 2d at 198.  Even where a warning provided by the manufacturer is inadequate, there can be no proximate causation unless the plaintiff proves that an adequate warning would have changed the prescribing physician's decision to prescribe the medication.  *Brasher v. Sandoz Pharm. Corp.*, 2001 U.S. Dist. LEXIS 18364, at *48-50 (N.D. Ala. 2001) (not available on Westlaw) (granting defendant's summary judgment motion where

---

[11] *Defendants' Interrogatory No. 15*:  State each and every fact upon which you base your contention that Teva's instructions or warnings for the use of cephalexin were false, misleading, incomplete or otherwise inadequate or improper and identify (with enough specificity to allow Defendants to make an effective request for production) each and every document that supports your contention.
*Plaintiff's Response*: Subject to and without waiving the foregoing objections, Defendants are referred to expert testimony.
*Plaintiff's Supplemental Response*:  Subject to and without waiving the foregoing objections, Defendants are referred to expert report and testimony of Lila Laux, Ph.D.
(Ex. Q, Pl.'s Supp. Resp. to Def.'s Interrog.)

plaintiff offered no evidence that a different warning from the manufacturer would have altered her physician's decision to prescribe the medication).  Moreover, "[t]he majority of the courts that have examined the issue have held that when a physician fails to read or rely on a drug manufacturer's warnings," proximate cause similarly cannot be established.  *See Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 856 (10th Cir 2003).[12]

In the instant case, even if the Court were to accept Plaintiff's argument that Teva USA's SJS warning was inadequate, which Teva USA denies, Plaintiff cannot establish proximate causation because Plaintiff has put forth no evidence that Dr. Jaalouk would not have prescribed cephalexin for Plaintiff if the drug contained a different or stronger SJS warning.

To start, there is no evidence that Dr. Jaalouk read Teva USA's cephalexin warning or the Keflex® warning contained in the PDR prior to prescribing this drug to Plaintiff.  Therefore, even if the SJS warning were stronger or in a different section of the label, as Plaintiff proposes, Dr. Jaalouk's decision to prescribe the drug would not have been affected.

Moreover, Dr. Jaalouk testified that she believes she was aware of the risk of SJS associated with cephalexin when she prescribed this drug to Plaintiff in 1998.  (Ex. R, Jaalouk Dep. 115:13-116:12.)  Dr. Jaalouk testified further that in prescribing cephalexin to Plaintiff, she considered:

> "the risk/benefit profile for cephalexin that [she was] aware of in 1998, and [she] made a decision as a physician based on all of [her] training, all of [her] education, all of [her] experience that . . . this product was appropriate for [her] patient under the circumstances that she presented to [her] in 1998."

---

[12] Although by law Teva USA's duty to warn extends only to the prescribing physician, proximate causation could not be established even assuming, *arguendo*, that a warning should have been provided to Plaintiff directly.  In 1998, Plaintiff was a minor (Ct. Doc. 1 ¶ 2), and her mother made decisions concerning Plaintiff's medical treatment and administered Plaintiff's medication.  (Ex. E, Hodges Dep. 7:20 – 9:12.)  However, Plaintiff's mother testified that she did not review the cephalexin package insert or any warnings prior to administering cephalexin to Plaintiff.  (*Id.* at 73:5-14, 241:13-23.)  Therefore, a different warning in the labeling would not have affected whether Plaintiff ingested cephalexin.

(*Id.* at 52:7-15.)  Finally, Dr. Jaalouk testified that she has prescribed cephalexin for the past ten years and continues to prescribe it today (*Id.* at 17:4-18), despite full awareness of the risk of SJS associated with cephalexin use (*Id.* at 93:11-16).  The record is completely devoid of any evidence of how Dr. Jaalouk would have acted if she were aware of a stronger or different SJS warning on a cephalexin label.  Therefore, Plaintiff has not and cannot meet her burden of proving that Dr. Jaalouk would not have prescribed cephalexin to Plaintiff on the basis of a different warning.  Similarly, Plaintiff has not and cannot demonstrate that changing the placement of the SJS warning (*i.e.*, moving it to the "Warnings" section of the label from the "Adverse Reactions" section, where it is contained) would have affected Dr. Jaalouk's conduct, given that Dr. Jaalouk specifically testified that she looks at the "Adverse Reactions" section for information concerning side effects.[13]  Thus, if Dr. Jaalouk had read the cephalexin label, she would have seen the SJS warning contained therein.

For the foregoing reasons, Plaintiff has failed to put forth any evidence establishing proximate causation, and Plaintiff's failure to warn claims must be dismissed.

**C.    Plaintiff Lacks Admissible Evidence of Specific Causation**

Finally, to succeed on her failure to warn claims, as well as any of her other claims, Plaintiff bears the burden of proving that Teva USA's product actually caused her injuries.  However, at the close of discovery, Plaintiff has presented no evidence in admissible form to establish that Plaintiff's SJS was caused by Teva USA's cephalexin product.

---

[13] "Q:  If you're looking at a package insert for side effects, where on the label do you look?  A.  I look at the adverse reaction."  (Ex. R, Jaalouk Dep. 124:13-16.)

The Eleventh Circuit has made clear that in pharmaceutical drug cases, a plaintiff must prove both general[14] and specific[15] causation, *i.e.*, both that the drug **can** cause the alleged injury and that the drug **did** cause the injury in the case at bar. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005) (plaintiffs in a drug product liability case must prove "the toxicity of the [drug] and that it had a toxic effect on them causing the injuries that they suffered"). The *McClain* court stressed the necessity of establishing medical causation through reliable expert testimony. *Id.; see also In re Baycol Products Litigation*, 321 F. Supp.2d 1118, 1126 (J.P.M.L. 2004) (holding that personal injury cases concerning drugs involve complex questions of medical causation beyond the understanding of a lay person, and thus require expert testimony on the issue of causation).

Plaintiff has failed to put forth admissible expert testimony to prove causation in this case. Plaintiff has not retained any treating physicians as expert witnesses; therefore, under the Federal Rules of Civil Procedure, Plaintiff's treating physicians are fact witnesses limited to providing opinions formed in the course of medical treatment. *See* Fed. R. Civ. P. 26. It is undisputed that none of Plaintiff's treating physicians at the time of treatment definitively concluded that Plaintiff's SJS was caused by cephalexin – Plaintiff's own expert witness, upon review of the relevant medical records, confirmed this. (Ex. J, Schlam Dep. 168:24-169:15.) And Plaintiff's sole retained expert witness on the issue of causation, Dr. Evan Schlam, has

---

[14] "General causation is concerned with whether an agent increases the incidence of disease in a group . . ." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005) (*quoting* Michael D. Green *et al.*, Reference Guide on Epidemiology, in Reference Manual on Scientific Evidence 392 (Federal Judicial Center, 2d ed. 2000)).

[15] "Specific, 'or individual causation . . . is established by demonstrating that a given exposure is the cause' of a particular individual's disease." *Dunn v. Sandoz Pharm. Corp.*, 275 F.Supp.2d 672, 676 (M.D.N.C. 2003) (internal citation omitted).

failed to provide any admissible evidence of causation to support Plaintiff's claims.[16]

First, while Teva USA does not dispute general causation in this case (indeed, the cephalexin label specifically warns of the risk of SJS), Teva USA points out that the increased risk of SJS from cephalexin exposure is extraordinarily low – "in the less than one per 10 million range."  (Ex. D, Lamm Report at 9.)

Second, Plaintiff's causation theory is undermined by Plaintiff's previous exposure to cephalexin on several occasions.  Plaintiff's expert witness Dr. Schlam testified that the risk of an individual developing a SJS or TEN reaction to cephalexin decreases with each exposure to cephalexin.  (Ex. J, Schlam Dep. 71:13-73:14.)  Dr. Schlam testified further that he is unaware of any articles in the worldwide peer-reviewed medical literature documenting a SJS or TEN reaction on an individual's third or fourth exposure to cephalexin.  (*Id.* at 72:17-73:14.)  In this case, it is undisputed that Plaintiff was prescribed cephalexin on at least three occasions prior to January 1998.  Therefore, Plaintiff's January 27, 1998 ingestion of cephalexin would have been Plaintiff's ***fourth*** exposure to this drug.  If we are to believe the uncorroborated testimony of a March 1998 ingestion of cephalexin, this would have been Plaintiff's ***fifth*** exposure.  Plaintiff's own expert witness has testified that a SJS or TEN reaction to cephalexin after the second

---

[16] Dr. Schlam's conclusions on causation were based on the erroneous assumption that Plaintiff had never ingested cephalexin prior to her alleged ingestion of cephalexin in January of 1998.  (Ex. S, Schlam Report at Barnhill 00040.)  As explained further *infra*, when Dr. Schlam's reasoning is applied to the facts as evidenced in the medical records, it leads to a contrary conclusion.

exposure becomes increasingly rare, and that he is unaware of *any* reports of a SJS or TEN reaction from a third exposure, not to mention fourth or fifth. 17  (*Id.*)

In sum, Plaintiff has presented no admissible expert evidence to prove the requisite element of specific causation underlying all of her claims.  In addition to undisputed evidence that SJS is an extremely rare reaction to cephalexin, Plaintiff's expert witness testified that he is unaware of any case reports where a SJS reaction occurred on the third, fourth or fifth exposure to the drug.  For these reasons, Plaintiff's claims must fail.

**III.  PLAINTIFF'S CLAIMS FAIL TO STATE A CLAIM INSOFAR AS ANY ATTEMPT TO IMPOSE TORT LIABILITY UPON TEVA USA UNDER STATE COMMON LAW IS PREEMPTED BY THE SUPREMACY CLAUSE OF THE CONSTITUTION AND FEDERAL LAW**

Plaintiff's claims must also fail insofar as they attempt to impose tort liability upon Teva USA under state common law, in conflict with federal law.  Teva USA has acquired significant new regulatory, legal, and evidentiary support for its federal preemption argument since the last time this Court considered the argument.  In April 2007, this Court denied Teva USA's Motion to Dismiss ("Motion to Dismiss") Plaintiff's Complaint on federal preemption grounds after finding that FDA regulations permit Teva USA to make unilateral changes in its cephalexin labeling to add new warnings or strengthen existing ones.  (Ct. Doc. 59.)   In January 2008, FDA promulgated proposed rulemaking clarifying that this interpretation of FDA regulations is

---

[17] There also may be a critical temporal flaw in Plaintiff's argument.  As noted *supra* at n.7, the only evidence in the record supporting a March 1998 ingestion date is self-serving testimony by Plaintiff's mother.  This testimony is at best unsupported and, likely, contradicted by the testimony of Plaintiff's treating physician and the documentary evidence.  Absent a March 1998 ingestion, Plaintiff's claim is essentially defeated by her own expert, Dr. Schlam, from whose testimony ineluctably follows the conclusion that a SJS reaction caused by Plaintiff's last documented ingestion of cephalexin (between January 27 and February 2, 1998), would have had to manifest ten days or more before Plaintiff's symptoms actually emerged on March 10, 1998.  Dr. Schlam testified that upon an individual's first exposure to a drug, he would expect a SJS reaction to present itself within three to four weeks after exposure. (Ex. J, Schlam Dep. 65:24-66:4.)  Dr. Schlam also explained in his expert report, citing to the New England Journal of Medicine, that on subsequent exposure a SJS reaction would occur more rapidly than even one to three weeks. (Ex. S, Schlam Report at Barnhill 00040.)  Teva USA does not rely upon this argument in support of the instant Motion, because there is at least arguably disputed evidence in the record as to the last ingestion date.  Nevertheless, Teva is constrained to note this highly tenuous element of Plaintiff's case.

incorrect, and unequivocally stating that manufacturers of generic drugs, such as Teva USA, cannot, and have never been permitted to, unilaterally change their drug labeling.  (Ex. T.)  In August 2008, FDA codified this proposed rulemaking into a Final Rule, which again confirms that warning enhancement is not and has never been available to ANDA holders.  (Ex. U.)  In addition, since April 2007 a clear trend on this issue has emerged among the federal courts, with three district courts holding in five separate cases that failure to warn claims against generic drug manufacturers are preempted by federal law.  Finally, at the close of discovery in this case, Plaintiff has not presented a shred of evidence to support her contention that Teva USA could have changed its cephalexin labeling.  In fact, all evidence in the case, including the testimony of Plaintiff's own expert witness, supports Teva USA's contrary conclusion.  Therefore, Plaintiff has not created a genuine issue of material fact as to whether Teva USA had the ability to change its cephalexin label, and Teva USA maintains that it had and has no such ability.  Accordingly, Plaintiff's state law claims should be dismissed on grounds of federal preemption.

## A.      Conflict Preemption Applies to Preempt Plaintiff's State Law Claims

The Supremacy Clause of the United States Constitution, article VI, clause 2, preempts any state law that conflicts with the exercise of federal power.  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982).  This Court, in ruling on Teva USA's Motion to Dismiss, recognized the essence of the doctrine of conflict preemption:

> "Under the doctrine of conflict preemption, state law is preempted 'to the extent that it actually conflicts with federal law.  Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, . . . or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"

(Ct. Doc. 59 at 4) (*citing Hillsborough County v. Automated Med. Lab.*, 471 U.S. 707, 713 (1985)).  The Court further acknowledged that "federal regulations may sometimes preempt state law."  (Ct. Doc. 59 at 7.)

Although this Court went on to hold that conflict preemption did not apply in the instant case because it was "possible to comply with the FDA's labeling requirements *and* provide additional warnings that might be necessitated by state law" (Ct. Doc. 59 at 7), Teva can now point to new regulations, case law, and expert testimony proffered by both parties to demonstrate to this Court that Plaintiff's state law claims do, indeed, create a conflict with federal law.

**B.      Since April 2007, FDA Reaffirmed on Several Occasions Its Long-Standing Position That Generic Drug Manufacturers May Not Unilaterally Strengthen or Amend Their Labeling**

As discussed in detail in Teva USA's Motion to Dismiss, the issue of conflict preemption in the instant case revolves around whether an ANDA holder, such as Teva USA, has a right to enhance warnings on the label for its product, unilaterally and without prior FDA approval. Plaintiff argues that Teva USA should have strengthened the SJS warning in its cephalexin labeling, and that a strengthened warning would have prevented Plaintiff's injuries.  Teva USA maintains that because it did not, and does not, have the right to make any changes to its cephalexin labeling, Plaintiff's state law claims seeking to hold Teva USA liable for failing to make such changes directly conflict with federal law and regulations and, thus, are preempted.

This Court previously denied Teva USA's federal preemption argument by finding that Teva USA could make changes to its cephalexin labeling through the mechanism of 21 C.F.R. § 314.70(c)(6)(iii)(A), the "Changes Being Effected Amendment" ("CBE") provision.  (Ct. Doc. 59.)  Teva USA respectfully asserts that FDA has repeatedly made clear that it does not interpret its regulations to permit ANDA holders to make changes in their labeling without prior FDA approval, and Teva USA's Motion to Dismiss set forth the Agency's past publications on the

21

issue.  (Ct. Doc. 18.)  Significantly, since the filing of Teva USA's Motion to Dismiss, FDA has

again articulated its position on the issue.  On January 16, 2008, in a move that should put an end

to any future debate of FDA's own position on § 314.70(c) as it applies to generic drug

manufacturers, FDA unequivocally reaffirmed that this CBE provision is not available to ANDA

holders:

> **CBE changes are not available for generic drugs approved under an abbreviated new drug application under 21 U.S.C. § 355(j).**  To the contrary, a generic drug manufacturer is required to conform to the approved labeling for the listed drug.  *See* 21 C.F.R. §314.150(b)(10); *see also* 57 FR 17950, 17953, and 17961.

73 Fed. Reg. 2848 at 2849 n.1 (Jan. 16, 2008) (emphasis added) (Ex. T).  The Agency explicitly

stated that this proposed rulemaking was intended to *codify long-standing FDA practice*

regarding when § 314.70(c) may be used to add safety-related information, such as enhanced

warnings, to an *NDA*.  *Id.* at 2849, 2851.  With respect to preemption, FDA explained in its

proposed rulemaking:

> Federal Law governs not only what information must appear in labeling, but also what information may not appear.
> * * *
> To the extent that state law would require a sponsor to add information to the labeling for an approved drug . . . without advance FDA approval based on information or data as to risks that are similar in type or severity to those previously submitted to FDA, or based on information or data that does not provide sufficient evidence of a causal association with the product, such a state requirement would conflict with federal law.

*Id.* at 2850 n. 3.

Just over a month ago, FDA again reasserted this position when it published its Final

Rule on Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics

and Medical Devices, 73 Fed. Reg. 49603 (August 22, 2008) ("Final Rule") (Ex. U).  The Final

Rule again **codifies the agency's long-standing view** concerning when a change to the labeling

may be made in advance of FDA's review, *id.* at 49603, and sets out express guidelines for label changes through CBE supplements pursuant to § 314.70(c).[18]  Notably, with respect to the argument about the right of an ANDA holder to avail itself of this regulatory provision, the Final Rule is directed **exclusively** to holders of a NDA, a biologics license application, or medical device premarket approval application, and purposely and unambiguously is **not** directed to ANDA holders.[19]  By implication, this is yet more evidence, if any was needed, that warning enhancement through CBE supplementation is *not* available to ANDA holders in this context. With respect to preemption, FDA in the Final Rule rejected arguments that its position was inconsistent with Congressional intent, commenting in the Preamble that, "the absence of an express preemption provision with respect to drugs [does not affect] the application of implied preemption."  *Id.* at 49605.

FDA has continued to take the same position on § 314.70(c) in *amicus curiae* briefs (some of the earlier briefs were discussed in Teva USA's Motion to Dismiss).  In December 21, 2007, FDA submitted an *amicus curiae* brief at the invitation of the Supreme Court, in which the agency explained that "[u]nder a correct reading of Section 314.70, [the generic drug manufacturer] could not have changed the labeling without prior FDA approval."  Brief for United States as *Amicus Curiae* on Petition for a Writ of Certiorari, *Wyeth v. Levine*, No. 06-1249, at 15 (U.S. Dec. 21, 2007) (Ex. V).  *See also* Brief for United States as *Amicus Curiae* Supporting Respondent, *Riegel v. Medtronic, Inc.*, No. 06-179, at 13 (U.S. Oct. 19, 2007) ("[The generic drug manufacturer] could not have lawfully marketed a product that deviated from the

---

[18] This Court previously concluded that FDA's position on § 314.70(c) (supporting Teva USA's argument herein) "represents an about-face from the agency's position—until 2001—that the FDA labeling rules were not intended to preempt state law." (Ct. Doc. 59 at 10).  However, FDA has now repeatedly explained that its position has not changed over time, and its August 2008 Final Rule and January 2008 proposed rulemaking were intended merely to *clarify* the regulations so as to prevent further misinterpretation.

approved version nor made any changes affecting the safety or efficacy of the device, including labeling changes, without first submitting a supplemental application to FDA.") (Ex. W).  FDA has also expressed its view on preemption in recent *amicus curiae* briefs, arguing that:  "FDA's approval of a drug, including its labeling, generally preempts state law claims challenging the drug's safety, efficacy, or labeling."  Brief for United States as *Amicus Curiae* on Petition for a Writ of Certiorari, *Wyeth v. Levine*, No. 06-1249, at 8 (U.S. Dec. 21, 2007).  The Solicitor General explained:

> FDA interprets the FDCA to establish both a 'floor' and a 'ceiling' with respect to drug labeling.   FDA's approval of labeling for a new drug reflects FDA's expert judgment that the labeling strikes the appropriate balance.  Where . . . FDA was presented with information concerning the relevant risk, a jury's imposition of liability based on a drug's FDA-approved labeling would interfere with FDA's expert judgment.

*Id.* at 11 (citation omitted).  *See also* Brief for United States as *Amicus Curiae* Supporting Respondent, *Riegel v. Medtronic, Inc.*, No. 06-179 (U.S. Oct. 19, 2007)[20]; Brief for United States as *Amicus Curiae*, *Colacicco v. Apotex, Inc.*, No. 05-CV-05500 (E.D. Pa. 2006) (Ex. X).[21]

---

[19] Because the Final Rule expressly does not concern ANDA holders, footnote 1 contained in the January 16, 2008 proposed rulemaking, cited *supra*, has been omitted as superfluous.

[20] The Supreme Court granted cert. in *Levine*, 128 S. Ct. 1118 (January 18, 2008), which will be argued in the October 2008 term.  In *Riegel*, a case involving medical devices rather than drugs, the Supreme Court ruled in February 2008 in favor of the manufacturer, holding that the plaintiff's claims were preempted by FDA's pervasive regulation of warnings for devices.  *Riegel v. Medtronic, Inc.*, 128 S.Ct. 999 (2008).  While regulation of medical devices is governed by different provisions of the Food and Drug Act than are drugs, and presents different issues for the preemption analysis to a degree, the 8-1 decision in *Riegel* and the broad language of the majority opinion suggests that the Supreme Court is favorably disposed to the preemption arguments as they relate to prescription drugs.

[21] The preemptive effect of FDA regulations is not limited to instances where the precise warning proposed by a plaintiff was explicitly approved or rejected by FDA.  This view wrongly assumes that FDA has not considered a particular warning where there is no express record of FDA approving or rejecting such a warning, thus greatly underestimating the in-depth level of highly technical analysis performed by FDA in approval of drug labeling.  For example, simply by looking at the SJS-related warning on the cephalexin label, one cannot ascertain all of FDA's considerations in arriving at that precise warning, and one cannot assume that a detailed analysis of stronger or weaker warnings had not been performed.

C.      **Since April 2007, Several Federal Courts Have Considered the Issue of Federal Preemption As It Applies to Generic Drug Manufacturers, and Have Unanimously Held That State Law Claims Against Generic Drug Manufacturers Are Preempted**

When this Court ruled on Teva USA's Motion to Dismiss in April 2007, there did not yet exist clear federal precedent concerning the exact question of whether federal preemption applies to failure to warn claims brought against ANDA holders.  In the past four months a clear trend has emerged, as three federal courts considered this issue in five separate cases and in all five cases found that state law claims were preempted.

In June 2008, the District Court for the District of Minnesota reached this conclusion in *Mensing v. Wyeth, Inc., et al.*, No. 07-3919 (N.D. Minn. June 17, 2008) (Ex. Y).  *Mensing* is a products liability case, in which the plaintiff alleged injuries as a result of ingesting a generic pharmaceutical drug.  After reviewing all of the FDA authority discussed *supra*, the court accepted the generic manufacturer defendants' arguments completely in language that, while lengthy, is worth quoting in full here:

> The Court concludes that under the federal statutory scheme, the labeling for generic drugs must always remain the "same as" that of the name brand drug and that ***a generic drug manufacturer cannot unilaterally change its label without prior FDA approval***.  Here, it is undisputed that at all relevant times, Actavis's and Pliva's MCP drug labels were the same as that of the listed drug Reglan.  Plaintiff's failure to warn claims against Actavis and Pliva rely on state law imposing a duty on the generic drug manufacturers to provide adequate warnings that Actavis and Pliva allegedly did not provide.  ***Any such duty to unilaterally heighten their warning labels, however, would directly conflict with the federal law requiring that their labels be the "same as" those of the listed drug, Reglan. Indeed, under these circumstances, it would be impossible for Actavis and Pliva to abide by both state and federal laws***.  If Plaintiff's claims were not preempted, Actavis and Pliva would be forced to choose between complying with the federal law while being exposed to state tort liability, or unilaterally adding a heightened warning to their labels at the risk of exposing themselves to federal liability.  ***This conflict would stand as an obstacle to the accomplishment and full purposes***

> *and objectives of the Hatch-Waxman Act, a key purpose of which is to increase the availability of low-cost generic drugs and to relax the generic approval and labeling process.*

*Id.* at 16-17 (emphasis added).

A few days earlier, the District Court for the Northern District of California applied the same reasoning to dismiss plaintiffs' state law claims against a generic drug manufacturer on the grounds of federal preemption in *Gaeta, et al. v. Perrigo Pharmaceutical Company, et al.*, No. 05-04115 (N.D. Cal. June 13, 2008) (Ex. Z), holding:

> Plaintiffs' causes of action seek to hold Perrigo liable for, in part, failing to warn of risks on the labeling for its drug.  Since including these warnings would put Perrigo's ANDA in jeopardy for failing to conform with the FDA's approved labeling for the listed drug, Plaintiffs' state law causes of action conflict with Perrigo's obligations under federal law.
> * * *
> The Court finds that Plaintiffs' causes of action are preempted to the extent that they allow for liability based on a lack of adequate warning.

*Id.* at 9.

Most recently, in August 2008, the District Court for the Southern District of Florida, in deciding three separate cases, reached the same conclusion with respect to federal preemption of products liability claims against a generic drug manufacturer in *Bolin v. SmithKline Beecham Corp.,* 2008 WL 3286973 (S.D. Fla. Aug. 7, 2008); *Masterson v. Apotex Corp.,* 2008 WL 3262690 (S.D. Fla. Aug. 7, 2008); and *Valerio v. SmithKline Beecham Corp.,* 2008 WL 3286976 (S.D. Fla. Aug. 7, 2008).  In these decisions, the court carefully analyzed much of the same case law cited by Teva USA in its Motion to Dismiss, including the Third Circuit opinion in *Colacicco v. Apotex, Inc.,* 521 F.3d 253 (3d Cir. 2008), *aff'g,* 432 F. Supp. 2d 514 (E.D. Pa. 2006) and, more importantly, the decisions in *Mensing* and *Gaeta*, and concluded in reliance upon the reasoning in *Mensing* that plaintiffs' claims were preempted:

> This Court agrees with the analysis and conclusion of the decision in *Mensing* finding preemption of state law failure to warn claims against a generic manufacturer/distributor such as the [generic manufacturer] Defendants.  Because the FDA, pursuant to the FDCA statutory scheme as amended by the Hatch Waxman Act, requires generic drugs to have the same labeling as listed drugs, these federal laws preempt such a state law claim.  Unlike a manufacturer of a listed drug, a generic manufacturer has a limited `ability to even suggest a labeling change, subject solely to the discretion of the FDA to change the labeling for both the generic and the listed drug.  Therefore, compliance with a state law duty to warn would conflict with the federal statutory scheme.

*Bolin*, 2008 WL 3286973 at 7; *Masterson* , 2008 WL 3262690 at 4; *Valerio,* 2008 WL 3286976 at 7.

These federal courts have recognized that the issue of federal preemption must be considered as it applies specifically to ANDA holders[22], and have concluded that conflict preemption applies in the situation of ANDA holders.  Therefore, the case law presented by Plaintiff in opposition to Teva USA's Motion to Dismiss, which case law this Court cited in its ruling on the Motion to Dismiss (Ct. Doc. 59 at 7), is inapposite because it only concerns NDA holders.  While in April 2007, no clear federal precedent yet existed addressing federal preemption of claims against generic drug manufacturers, new federal case law exists now and unanimously mandates the dismissal of Plaintiff's state law claims on federal preemption grounds.  Moreover, considering that the issue of federal preemption is currently before the United States Supreme Court in *Wyeth v. Levine* and is scheduled for argument in November 2008, in the interest of judicial economy this Court may wish to hold in abeyance a decision on

---

[22] "[T]he issue relevant to the case at bar [is] whether claims against 'generic drug manufacturers are preempted on the basis of their obligations under the Hatch-Waxman Amendments [to the FDCA].'"  *Bolin*, 2008 WL 3286973 at 6; *Masterson* , 2008 WL 3262690 at 3; *Valerio*, 2008 WL 3286976 at 6.

the instant Motion, as it relates to preemption, pending a Supreme Court ruling providing

potential guidance or a binding precedent. [23]

> **D.      Plaintiff Has Presented No Evidence that Teva USA Is Permitted to Alter Its
> Cephalexin Labeling; Rather, Plaintiff's Own Expert Witness Supports Teva
> USA's Contrary Position**

Through the course of discovery, Plaintiff has set forth absolutely no evidence to support

her contention that Teva USA is unilaterally permitted to change its cephalexin labeling.

Plaintiff has designated Dr. Lila Laux as her expert witness on issues of warnings, labels,

and instructions associated with Teva USA's generic cephalexin product.  Plaintiff has pointed

exclusively to Dr. Laux's testimony and expert report to support Plaintiff's contentions

concerning Teva USA's allegedly false or inadequate labeling and warnings.[24]  However, even

considering the testimony of Dr. Laux in a light most positive to Plaintiff – as is required for

purposes of this Motion – Dr. Laux's testimony does not support Plaintiff's position that Teva

USA was permitted to unilaterally alter the warnings and labeling for its cephalexin product.

To start, Dr. Laux – Plaintiff's sole expert witness on the issue of labeling and warnings –

has no formal education or training in FDA regulations or labeling requirements, or in the area of

prescription pharmaceutical warnings or labels. (Ex. P, Laux Dep. Tr. 57:19 - 65:5.)  What's

more, Dr. Laux herself testified that she cannot offer "an expert opinion on what Teva was

permitted to do or not permitted to do under the laws associated with pharmaceutical labeling."

(*Id.* at 64:23-65:5.)  Therefore, Plaintiff has failed to offer *any* expert opinion on Teva USA's

obligations under FDA regulations.

---

[23] Teva USA believes the instant Motion should be granted for all of the reasons stated in Sections II and IV.
However, holding a decision on preemption in abeyance pending the Supreme Court's decision in *Wyeth v. Levine*
may be appropriate, if necessary.

[24] *See supra* n. 11.

Even if the Court were to accept Dr. Laux as an expert witness qualified to testify on issues regarding pharmaceutical labeling and warnings (despite her own admission to the contrary), Dr. Laux's testimony unequivocally supports Teva USA's position on its inability to change its cephalexin labeling.  After reviewing FDA's January 16, 2008 proposed rulemaking, discussed *supra*, Dr. Laux testified that in order to make a change to its cephalexin label, such as inserting a black box warning, Teva USA "would have to go to the FDA or to the originator of the drug and work that way rather than trying to just put [the black box warning] on there themselves."  (*Id.* at 218:7-14.)  Dr. Laux testified further that she has "no basis for disagreeing with [Teva USA's expert FDA regulatory witness] . . . who said that the FDA wouldn't let [Teva USA] change this labeling unilaterally."  (*Id.* at 240:11-15.) As such, Plaintiff's own expert witness on the issue of labeling and warnings does not disagree with the expert report submitted by Teva USA, which reads in pertinent part:

> Generic drug manufacturers cannot add to or revise any warnings on its product labeling without the FDA's express direction or prior approval. . . .  The FDA position has always been that under 21 C.F.R. § 314.70(c), no labeling changes can be made unilaterally by a generic manufacturer.

(Ex. AA, Pollock Report at 6-7.)

In sum, Plaintiff's only witness and sole piece of evidence concerning Teva USA's warnings and labeling for its cephalexin product support Teva USA's position that it is not permitted to change its cephalexin label.

The lack of evidence presented by Plaintiff to support her federal preemption position, in conjunction with FDA's recent rulemaking and recent federal case law, warrants this Court's examination of the issue of federal preemption in the context of summary judgment, and further warrants dismissal of Plaintiff's state law claims on federal preemption grounds.

**IV.    PLAINTIFF'S REMAINING CLAIMS FAIL BECAUSE THEY ARE ENTIRELY UNSUPPORTED BY ANY EVIDENCE IN THE RECORD**

**A.    Plaintiff Has Not Set Forth a Claim For Failure to Use Reasonable Care in Formulating and Manufacturing Cephalexin**

Plaintiff's claim of Teva USA's alleged negligence in failing "to use reasonable care in formulating and manufacturing Cephalexin" (Ct. Doc. 1 ¶ 22a) is entirely contingent on a failure to warn argument, and must fail for the reasons discussed *supra*.

Specifically, in response to Defendants' Interrogatory No. 13 asking Plaintiff to identify each and every fact and document supporting Plaintiff's contention that the cephalexin she ingested was defectively designed or manufactured, Plaintiff states as follows:

> Subject to and without waiving the foregoing objections, the Cephalexin was defective with regard to the warnings and product literature.

(Ex. Q, Pl.'s Supp. Resp. to Def.'s Interrog.)

Outside of the Complaint, which contains merely a boilerplate and unfounded allegation of Teva USA's negligence in formulating and manufacturing cephalexin, Plaintiff has not alleged anywhere in her pleadings or expert reports any defect in the *formulating* or *manufacturing* of Defendants' cephalexin product.  Without any evidentiary support for Plaintiff's allegation in her Complaint, this claim must fail.

**B.    Plaintiff Has Not Set Forth a Claim of Inadequate Pre-Clinical and Clinical Testing of Cephalexin**

No genuine issue of material fact exists as to whether Teva USA can be held liable for failing to conduct pre-clinical and clinical testing to determine the effective use and safety of its cephalexin product (Ct. Doc. 1 ¶ 22c).  It cannot.  Federal regulations do not require or expect a generic drug manufacturer, such as Teva USA, to conduct pre-clinical or clinical testing of its

generic pharmaceutical drugs, and Teva USA was abiding by specific federal regulations in not conducting such testing of its cephalexin product.  21 U.S.C. § 321.

Congress and FDA have enacted statutory provisions and regulations to encourage the manufacture and marketing of generic drugs in the public policy interest of fostering competition and promoting the availability of lower cost medical care and affordable prescription drugs.  As discussed *supra*, under these regulations and consistent with these public policy interests, the generic manufacturer is not required to duplicate testing for safety or effectiveness of its generic drug, but must instead rely on information that is wholly derivative of information already provided by the innovator manufacturer.  *See* 21 U.S.C. § 321(aa).  Thus:

> the manufacturer of a pioneer drug must conduct tests on humans that show the product to be safe and effective and submit the results in a new drug application (NDA).  A manufacturer of a generic drug must conduct tests that show the generic drug is the same as the pioneer drug and that it will be properly manufactured and labeled.

H.R. Rep. No. 98-857, at 16 (Ex. BB).

Plaintiff has not presented a shred of evidence to support her claim that Teva USA had a duty to conduct pre-clinical or clinical safety and efficacy studies in connection with its cephalexin product.  In fact, Plaintiff cannot possibly present any evidence supporting this contention, because imposing a duty to conduct pre-clinical or clinical testing on a generic drug manufacturer plainly contravenes federal law and regulations.  Accordingly, Plaintiff's claim that Teva USA was negligent in failing to conduct such testing must fail.

### C.   Plaintiff Has Not Set Forth a Claim of Inadequate Post-Marketing Surveillance

Plaintiff has not presented any evidence to create a genuine issue of material fact as to whether Teva USA complied with its post-marketing surveillance requirements in connection

with its cephalexin product (Ct. Doc. 1 ¶ 22c).  Teva USA has complied with all such requirements.

To assist FDA with its oversight and continuing regulation of approved drugs, there exist extensive requirements for post-marketing reporting of adverse drug experiences for both innovator and generic drug manufacturers, and a requirement of an annual report summarizing "significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product."  21 C.F.R. §§ 314.80, 314.81(b)(2)(i).

Teva USA has put forth abundant evidence, in the form of documents and deposition testimony, of its compliance with post-marketing requirements.  Teva USA provided Plaintiff with Teva USA's entire file containing cephalexin-related adverse event reports.  Teva USA also provided Plaintiff with yearly and periodic adverse event reports submitted to FDA concerning Teva USA's cephalexin product.  Dr. James Michael Nicholas, currently Senior Director of Teva USA's Regulatory Affairs and former manager of Defendants' Pharmacovigilance Department, provided extensive deposition testimony concerning Teva USA's Pharmacovigilance Department and concerning Teva USA's compliance with FDA post-marketing requirements, both in general and with respect to Teva USA's cephalexin product.  (Ex. CC, Nicholas Dep. 83:14 – 87:10.)

Plaintiff has not identified any facts that contradict or call into question this concrete and abundant evidence of Teva USA's compliance with its post-marketing requirements with respect to Teva USA's cephalexin product.  Therefore, Plaintiff's claim must fail.

**D.     Plaintiff Has Not Set Forth a Claim For Breach of Express Warranty**

Plaintiff's claim that Teva USA "expressly warranted in the product inserts that Cephalexin is a safe and effective drug" (Ct. Doc. 1 ¶ 25) fails because it blatantly mischaracterizes the complexities of pharmaceutical labeling.  Indeed, the package insert for Teva USA's cephalexin product contains no such specific language.  Moreover, Teva USA did

not intend nor, as a matter of law, can its labeling be construed as the express warranty alleged by Plaintiff.  Rather, the label is information that Teva USA is required by the FDCA and the FDA's implementing regulations to disclose to the medical community, and does not contain any specific representations that the product is "safe."  Cephalexin, like other prescription drugs, is deemed to be inherently dangerous, that is, "incapable of being made safe for [its] intended and ordinary use."  Restatement (Second) of Torts (1965) § 402A, Comment k.  Teva USA's package insert for cephalexin advises that the drug may cause serious side effects.  All prescription drugs carry dangers inherent in their usage, and prescribing physicians can weigh the risks as well as the benefits in making prescribing decisions.  Patently, insofar as the cephalexin label expressly identifies SJS as a potential adverse reaction, there can have been no express warranty to Plaintiff that she would not experience this adverse reaction.

To the extent that Plaintiff's express warranty claim is contingent on a failure to warn argument – that Teva USA failed to advise patients or doctors prescribing cephalexin that some patients may experience skin reactions or SJS – the claim also fails for the reasons set forth in the section addressing Plaintiff's failure to warn claims.

### E.    Plaintiff Has Not Set Forth a Claim For Breach of Implied Warranty

This Court previously declined to dismiss Plaintiff's breach of implied warranty claim (Ct. Doc. 1 ¶ 26) on the grounds that Teva USA's argument for dismissal was based on facts outside the pleadings – *i.e.* the number of people who have experienced SJS from ingestion of cephalexin.  (Ct. Doc. 59 at 13.)  Teva USA now asks this Court to dismiss the breach of implied warranty claim on the basis of concrete evidence of the exceedingly low incidence rate of SJS associated with cephalexin.  Plaintiff has presented no evidence to the contrary.

Breach of implied warranty under Alabama law is defined statutorily in Ala. Code § 7-2-314 (2005).  Plaintiff's only viable implied warranty claim under the Alabama Code is that Teva

USA's Cephalexin Product is not "fit for the ordinary purposes for which such goods are used." Ala. Code § 7-2-314(2)(c).  As applied by the Alabama Supreme Court, in the case of drug products liability such a claim is viable only if the alleged adverse drug reaction is one experienced by more than "a very small or insignificant number of people."  *Griggs v. Combe, Inc.*, 456 So. 2d 790, 793 (Ala. 1984).  Plaintiff previously argued that "Defendant has not demonstrated that only a 'very small or insignificant number of people' have suffered SJS after ingesting Cephalexin®."  (Ct. Doc. 42 at 17.)  Teva USA can now so demonstrate.  Plaintiff's own expert witness testified that the development of SJS with the use of cephalosporin is "a rare occurrence."  (Ex. J, Schlam. Dep. 39:2-5.)  Teva's expert epidemiologist Dr. Lamm, relying on and citing to extensive relevant literature and medical studies, estimates that the increased risk of SJS from cephalexin exposure is extraordinarily low – "in the less than one per 10 million range." (Ex. D, Lamm Report at 9.)  Plaintiff's expert Dr. Schlam declined at his deposition to cite contrary incidence data and furthermore, admitted that he is not an expert in epidemiology and thus is not qualified to respond to Dr. Lamm on this issue.  (Ex. J, Schlam Dep. 43:17-19.)

Thus, Plaintiff cannot prove her cause of action for breach of implied warranty of merchantability because Plaintiff has not and cannot present evidence that more than "a very small or insignificant number of people" have experienced SJS as a result of ingesting cephalexin.  Indeed, all the evidence points to the conclusion that Teva USA's cephalexin product is merchantable and fit for its ordinary purpose.

### F.     Plaintiff Has Not Set Forth a Claim For Punitive Damages

Plaintiff's claim for punitive damages fails as a matter of law.  In order to recover punitive damages under Alabama law, a plaintiff must show "by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff."  Ala. Code § 6-11-20(a) (1987).  In the instant case,

Plaintiff's claim for punitive damages is premised entirely on the bald and sweeping statement in Plaintiff's Complaint that Teva USA acted with gross negligence, malice, fraud, ill will, recklessness and/or willful disregard for Plaintiff's safety.  (Ct. Doc. 1 ¶¶ 24, 29.)  However Plaintiff has neither elicited nor proffered any evidence whatsoever to support her claim of punitive damages, much less sufficient evidence to meet the strict clear and convincing standard. Therefore, Plaintiff's punitive damages claim fails.

## CONCLUSION

For the foregoing reasons, Teva USA respectfully requests that this Honorable Court enter an Order granting Teva USA summary judgment and dismissing with prejudice all of Plaintiff's claims against Teva USA.

Respectfully submitted this 10th day of October, 2008.

**s/ Joseph P.H. Babington**
JOSEPH P.H. BABINGTON (BABIJ7938)
PATRICK C. FINNEGAN (FINNP3533)
Attorneys for Defendants Teva Pharmaceuticals
USA, Inc. and Teva Pharmaceutical Industries, Ltd.
jpb@helmsinglaw.com;
pcf@helmsinglaw.com

HELMSING, LEACH, HERLONG,
  NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, Alabama 36652
251-432-5521
251-432-0633 (fax)

OF COUNSEL:

GLENN S. KERNER
JOANNE M. GRAY
YULIYA GERTSBERG SCHARF
GOODWIN PROCTER, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
(212) 355-3333 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of October, 2008, the foregoing pleading was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel who have appeared in the case and who have registered for such notification and I have mailed copies to all parties not registered to receive CM/ECF notification as follows:

Shelly A. Sanford, Esquire
T. Christopher Pinedo, Esquire
Anthony C. Coveny, Esquire
Sanford Pinedo, LLP
2016 Bissonnet Street
Houston, Texas 77005

Marcus L. Stevenson, Esquire
2016 Bissonnet Street
Houston, Texas 77005

E. Frank Woodson, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, PC
Post Office Box 4160
Montgomery, Alabama 36103-4160

Hirlye R. Lutz, III
Cory, Watson, Crowder and DeGaris
2131 Magnolia Avenue
Birmingham, Alabama  35205


                                        **s/ Joseph P.H. Babington**
                                        OF COUNSEL

Doc# 181876

36